b

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

STEPHANIE A STROTHER, Plaintiff — CIVIL DOCKET NO. 1:23-CV-00171

VERSUS — JUDGE DRELL

COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, Defendants — MAGISTRATE JUDGE PEREZ-MONTES

# REPORT AND RECOMMENDATION

Before the Court is an appeal by Stephanie Amanda Strother ("Strother") from the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for a period of disability and disability insurance benefits. ECF No. 1.

Because the administrative law judge ("ALJ") committed a harmful legal error, IT IS RECOMMENDED that Strother's appeal (ECF No. 1) be GRANTED, the final decision of the Commissioner be VACATED, and the case be REMANDED for further proceedings consistent with this Report and Recommendation.

## I. Background

### A. Procedural History

On November 23, 2020, Strother filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date of March

28, 2020. ECF No. 8-1 at 19, 58. After her claim was denied initially and upon reconsideration, she requested a hearing. *Id.* at 58, 67, 78–81, 89–99.

On July 28, 2022, the ALJ convened a *de novo* telephonic hearing. *Id.* at 32–52. Strother, her attorney, a vocational expert ("VE"), and a hearing reporter were present. *Id.* at 34. The ALJ found that Strother had not been under a disability within the meaning of the Social Security Act ("SSA") from the alleged disability onset date through March 31, 2022, the date Strother was last insured. *Id.* at 27. The Appeals Council declined Strother's request for review, *see id.* at 5–8, and the ALJ's decision became the final decision of the Commissioner.

Strother appealed the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). ECF No. 1.

**B. <u>Medical Records</u>**

In 2013, Strother was struck by a vehicle while walking across a street. ECF No. 8-1 at 420, 438.

On October 30, 2018, Strother went to Rapides Family Practice for a follow-up visit for her anxiety. *Id.* at 447. She was assessed with anxiety, primary insomnia, and essential hypertension. *Id.* at 448.

On December 5, 2018, Strother returned to Rapides Family Practice complaining of mild, generalized musculoskeletal pain, a fever, and a flare-up of her chronic neck, upper back, and shoulder pain. *Id.* at 444. Upon examination, she had "[r]eproducible tenderness with palpation over her posterior cervical and thoracic musculature bilaterally." *Id.* She was assessed with viral illness, paroxysmal

supraventricular tachycardia, chronic neck pain, and essential hypertension. *Id.* at 444–45.

On January 4, 2019, Strother returned to Rapides Family Practice complaining of atypical chest pain and an occasional stabbing sensation radiating to her back. *Id.* at 441. She received an electrocardiogram ("EKG") that indicated she had normal sinus rhythm and showed no signs of ischemia or arrhythmias, unstable angina, decompensated congestive heart failure, or uncontrolled ventricular arrhythmias. *Id.* at 442, 454. She was observed to be "stable, talkative, in good spirits[,] and in no distress," and her medical provider believed the symptoms were likely related to gastric reflux. *Id.* She was assessed with atypical chest pain, paroxysmal supraventricular tachycardia, essential hypertension, anxiety, and chronic neck pain. *Id.* at 442.

On February 25, 2019, Strother returned to Rapides Family Practice complaining of chronic neck pain. *Id.* at 438. During this visit, she reported that she attended weekly chiropractic sessions and had received multiple steroid injections to treat her cervical disc disease. *Id.* at 438. The injections purportedly provided "some relief." *Id.* She was assessed with cervical disc disease, anxiety, and chronic neck pain. *Id.*

On May 31, 2019, Strother went to Rapides Family Practice for a follow-up visit for her anxiety. *Id.* at 435. She was assessed with anxiety, atypical chest pain, chronic neck pain, and obesity. *Id.* at 436.

On August 2, 2019, Strother returned to Rapides Family Practice complaining of an arthritis flare-up in her neck, shoulders, right elbow, right hand, and right-hand fingers. *Id.* at 432. Upon examination, she had reproducible tenderness with palpation over her cervical and thoracic paraspinous musculature, right shoulder, right elbow, right hand, and right wrist. Still, she had a full range of motion and good muscle strength in both her upper and lower extremities. *Id.* at 433. She was assessed with arthritis, essential hypertension, cervical disc disease, anxiety, Von Willebrand's disease, and chronic neck pain. *Id.*

On January 30, 2020, Strother returned to Rapides Family Practice to treat a second-degree burn on her right forearm. *Id.* at 429. She reportedly burned her forearm while lighting a fire near her home. *Id.*

On September 17, 2019, Strother went to Rapides Urgent Care complaining of elbow pain. *Id.* at 303. Upon examination, she had a mild flexion limitation, mild extension limitation, moderate generalized tenderness, and mild swelling in her right elbow. *Id.* at 304. Her tennis elbow test and Cozen's test were positive. *Id.*

On September 23, 2019, Strother went to Rapides Family Practice. *Id.* at 509. She reported having hot flashes, fatigue, appetite loss, night sweats, ringing in her ears, sinus trouble, lightheadedness, heartburn, constipation, muscle pain, muscle stiffness, joint pain, joint swelling, back pain, dizziness, loss of balance, weakness of limbs, loss of sensation, tingling, nervousness, restlessness, difficulty sleeping, and bruising. *Id.* at 509–10. Her laboratory findings were suggestive of Von Willebrand's disease. *Id.* at 511–12. She was diagnosed with Von Willebrand's disease, benign neo

parathyroid adenoma, anemia, disease or syndrome, cardiac murmurs, general osteoarthrosis, fatigue and malaise, and excessive menstruation. *Id.* at 509.

On November 10, 2019, Strother went to Rapides Urgent Care complaining of a cough, chills, decreased appetite, fatigue, and wheezing. *Id.* at 299. Upon examination, she had diffuse wheezing. *Id.* at 300. She received a chest X-ray and was assessed with pneumonia and acute bronchitis. *Id.* at 300, 307.

On March 13, 2020, Strother went to Rapides Regional Medical Center complaining of flu-like symptoms and was assessed with bronchitis. *Id.* at 309–11. 315. On March 19, Strother went to the Rapides Urgent Care complaining of difficulty breathing, cough, and a fever. *Id.* at 296. She was again assessed with acute bronchitis. *Id.* at 297.

On April 2, 2020, Strother met with Dr. Joan Brunson, M.D., ("Dr. Brunson") at Brian Clinic, LLP. *Id.* at 365. Strother was waiting for COVID-19 test results and reported that she had had a fever for about four days and a cough for several months. *Id.* She was using a home nebulizer treatment with her asthma medications and stated her cough had been responding to her inhaled bronchodilators. *Id.* Dr. Brunson assessed her with an acute upper respiratory infection and mild intermittent asthma. *Id.* at 366. Dr. Brunson advised her to go to the emergency room. *Id.*

On April 9, 2020, Strother saw Dr. Brunson for a follow-up visit and reported she was feeling better but still had a low-grade fever. *Id.* at 363. She further reported she was no longer having shortness of breath associated with her asthma. *Id.* Dr.

Brunson assessed her with an acute upper respiratory infection, mild intermittent asthma, and essential (primary) hypertension. *Id.* at 364.

On May 12, 2020, Strother saw Dr. Brunson for a follow-up visit. *Id.* at 360. She reported she had been taking an iodine supplement. *Id.* Dr. Brunson assessed her with essential (primary) hypertension, iodine-deficiency related thyroid disorders, and unspecified asthma. *Id.* at 366.

On August 9, 2020, Strother tested positive for COVID-19. *Id.* at 319.

On August 15, 2020, Strother went to Rapides Regional Medical Center complaining of a persistent cough and worsening shortness of breath following treatment for COVID-19. *Id.* at 319. She received an echocardiogram ("EKG"), which indicated sinus tachycardia and left ventricular hypertrophy with a mild repolarization abnormality. *Id.* at 317, 325. No visualized active chest disease was observed in her chest X-ray. *Id.* at 318. Strother was assessed with COVID-19 and a fever. *Id.* at 325.

On August 18, 2020, Strother returned to Rapides Regional Medical Center and again complained of shortness of breath. *Id.* at 330. Her chest x-ray indicated worsening bilateral lung infiltrates and potentially some features of viral pneumonia. *Id.* at 329. Strother was assessed with COVID-19 infection and pneumonia. *Id.* at 331. She was released for outpatient treatment with antibiotics and steroids. *Id.* at 336.

On August 19, 2020, Strother returned to Rapides Regional Medical Center. *Id.* at 336. She reported that she had gone to urgent care and been referred to the emergency department after she was found to be hypoxic. *Id.* Strother complained of

a burning sensation in her chest, generalized weakness, shortness of breath, and wheezing. *Id.* at 337. She was assessed with a fever, COVID-19, shortness of breath, asthma, and Von Willebrand's disease. *Id.* at 340.

On August 20, 2020, Strother received an EKG and chest x-ray at Rapides Regional Medical Center. *Id.* at 327–28. Her EKG was normal but indicated that Strother had sinus rhythm with a first-degree A-V block. *Id.* at 327. Her chest x-ray indicated mild improvement. *Id.* at 328.

On September 1, 2020, Strother saw Dr. Bruson for a follow-up visit. *Id.* at 358. Strother reported that she was struggling with anxiety after her recent covid pneumonia. *Id.* Dr. Brunson assessed her with acute respiratory disease and unspecified asthma. *Id.* at 359.

On November 6, 2020, Strother saw Dr. Brunson and complained of attention-deficit hyperactivity disorder ("ADHD") that manifested as fidgeting, easy distractibility, inability to complete tasks, and difficulty sustaining her attention. *Id.* at 355. She reported that her recent COVID-19 infection has worsened her ADHD symptoms. *Id.* She also complained of having chronic neck pain and headaches following her COVID-19 infection. *Id.* Dr. Bruson assessed her with ADHD and cervicalgia. *Id.* at 456.

On December 15, 2020, Strother saw Dr. Brunson for a follow-up visit. *Id.* at 352. She reported that she had had no falls in the last year, but Dr. Bruson observed that she was at risk for falling. *Id.* Strother further reported that she had chronic shortness of breath after her COVID-19 infection, her arms had occasionally been

going numb when she had neck pain, and she had panic attacks. *Id.* She stated that Adderall had helped her with her overall functioning. *Id.*

On February 25, 2021, Strother complained to Dr. Brunson that she continued to have many symptoms after her previous COVID-19 infection, including severe fatigue, worsening asthma (which required the use of daily inhalers), shortness of breath upon exertion, worsening brain fog, and worsening mood swings and anxiety. *Id.* at 387. She additionally reported that she continued to have sensitivity to cleaning products, her hands were swelling, and she had morning stiffness. *Id.* She reported that she could not work because of her symptoms. *Id.* Dr. Brunson assessed her with COVID sequelae, other asthma, stiffness of an unspecified hand, and ADHD. *Id.* at 389.

On March 17, 2021, Strother complained to Dr. Brunson of a mouth ulcer, general myalgia, abdominal distension and bloating, a diagnosis of behavioral and emotional disorders, wheezing (with exertion and upon exposure to allergens), and worsening mood swings and anxiety after her COVID-19 infection. *Id.* at 383. She reported that she had been struggling with "jitters" when taking her Adderall. *Id.* Dr. Brunson assessed her with abnormal immunological findings in serum, abdominal distension (gaseous), and other specified behavioral and emotional disorders. *Id.* at 385.

On April 21, 2021, Strother met with Dr. Mansi Shah, M.D., ("Dr. Shah") at the Highland Clinic. *Id.* at 400. Strother complained of "pain 'all over,'" diffuse arthralgia and myalgia, intermittent swelling in her hands and feet, numbness and

tingling in her hands, joints locking up in her hands, and morning stiffness. *Id.* at 402. She reported that those symptoms had been "going on for years" but had become worse over the "past 3-4 years," and she now had "difficulty doing her daily activities and sleeping." *Id.* Strother additionally complained of fatigue, night sweats, weight fluctuations, mouth sores, dry mouth and eyes, vision changes, dyspnea, edema, irregular heartbeat/palpitations, abdominal pain, heartburn, nausea, vomiting, headache, memory impairment, paresthesia, depression, anxiety, photosensitivity, rash, bone/joint symptoms, and muscle weakness. *Id.* at 405.

Strother received x-rays of her hands. *Id.* at 400–01. Both x-rays were unremarkable. *Id.* Upon examination, Dr. Shah observed that Strother had features of fibromyalgia but also had "a lot of nonspecific symptoms." *Id.* at 402. He further observed that she had a tender lumbar spine and was positive for fibromyalgia tender points, but she otherwise had a normal range of motion. *Id.* at 405. Dr. Shah reported that he would obtain "extensive baseline labs and imaging studies to evaluate for any additional etiology for her symptoms." *Id.* Dr. Shah also ordered a full lupus panel because Strother had a positive antinuclear antibody. *Id.*

On April 29, 2021, Strother met with Dr. Brunson for a follow-up visit and represented that she had been diagnosed with an acute upper respiratory infection. *Id.* at 424. She reported that her cough had improved, but, following her COVID-19 infection, she had not regained her strength, frequently wheezed and suffered from upper respiratory symptoms, had to take four breathing treatments each day, got dizzy, and generally felt like she did not "get enough air." *Id.* She additionally

reported that her Adderall caused her to be jittery, but Vyvanse had been more effective. *Id.* Finally, Strother complained of wheezing (with exertion and upon exposure to allergens), daily neck pain, arthritis developing post traumatic, mood swings and anxiety after her COVID-19 infection, and brain fog. *Id.* Dr. Bruson assessed her as having an acute upper respiratory infection, mild intermittent asthma, chronic fatigue, ADHD, and fibromyalgia. *Id.* at 426.

On June 30, 2021, Strother met with Dr. Brunson for a follow-up visit. *Id.* at 420. She reported that she had received abnormal lupus tests and met with a rheumatologist. *Id.* However, she had been unable to follow up with the rheumatologist because of a death in the doctor's family. *Id.* Strother additionally reported wheezing (with exertion and upon exposure to allergens); finger swelling; joint, ankle, and feet pain; worsening mood swings and anxiety, chronic shortness of breath, and tachycardia following her COVID-19 infection; traumatic arthropathy and pain in her cervical spine, mid-thoracic, lower back, and pelvis "from her having been struck by a car as a pedestrian"; arthritic pain in her left hip; and daily pain from her fibromyalgia. *Id.* Upon examination, Strother was observed to be anxious, and her hands and elbows were tender. *Id.* at 422. Dr. Brunson assessed her with abnormal immunological findings in serum, fibromyalgia, COVID-19 sequelae, and traumatic arthropathy. *Id.* Dr. Brunson documented that Strother had "not been able to work due to multiple co-morbid issues...traumatic arthritis, inflammatory arthritis and covid sequelae." *Id.*

On July 14, 2021, Strother went to Rapides Regional Medical Center complaining of a mild, non-productive cough. *Id.* at 474. She reported that she had been assessed with an upper respiratory infection earlier that week and had improved but had a lingering cough. *Id.* She was assessed with bronchitis. *Id.* at 478.

On September 21, 2021, Strother went to the Brian Clinic, LLP, for a follow-up visit, during which she reported that she had been riding on a four-wheeler when it "nearly flipped" and "she hit the metal rack with her back and shoulders." *Id.* at 462. She additionally reported that she continued to have wheezing (with exertion and upon exposure to allergens) and increased mood swings and anxiety post-COVID-19. *Id.* She still had to use her inhaler because of her "persistent lung symptoms after covid." *Id.* She also reported bloating and cramping and asked if she could be referred for a colonoscopy. *Id.* Upon examination, she was observed to have tenderness to her trapezius muscles. *Id.* She was assessed with lower back pain, cervicalgia, ADHD (combined type), COVID-19, fibromyalgia, generalized abdominal pain, and essential (primary) hypertension. *Id.* at 464. X-rays were ordered to assess her lower back pain, and she was referred for an endoscopy. *Id.*

On September 21, 2021, Strother received an x-ray of her cervical and lumbar spine. *Id.* at 503–04. The impression of her cervical spine x-ray was possible muscle spasm with focal degenerative disc disease at C5-C6. *Id.* at 503. The impression of her lumbar spine x-ray was diffuse mild degenerative disc disease below her L1-L2. *Id.* at 504.

On January 5, 2022, Strother went to the Brian Clinic, LLP, for a follow-up visit. *Id.* at 459. She reported that she had recently tested positive for COVID-19, she was coughing a lot, and her oxygenation was at 93–96%. *Id.* She was taking nebulizers to treat her symptoms. *Id.* She was assessed with COVID-19. *Id.* at 461.

On March 23, 2022, Strother went to Rapides Regional Medical Center after she fell. *Id.* at 466. She complained of a headache, nausea, pain on walking, back pain, extremity pain, joint pain, neck pain, swelling, dizziness, headache, and lightheadedness. *Id.* at 466–67. Upon examination, she had tenderness in her lumbar paraspinal, lumbar spine, right shoulder, right wrist, right hand, right knee, and left ankle; a reduced range of motion in her right shoulder, right wrist, and right hand; and swelling in her left ankle. *Id.* at 469.

Strother received CT scans of her lumbar spine, cervical spine, and head. *Id.* at 469–70. All were negative for traumatic abnormalities, fractures, or dislocations. *Id.* at 469-70. However, the CT scan of her lumbar spine indicated she had degenerative spondylosis. *Id.* at 472, 498. Strother's CT scan of her cervical spine indicated minimal scoliosis, mild-to-moderate spondylosis at her C5-C6, mild central stenosis and foraminal stenosis, and calcified plaque in her carotid arteries. *Id.* at 496. Strother also received x-rays of her shoulder, ankle, knee, and wrist. *Id.* at 470–71. No significant abnormalities were observed in those x-rays. *Id.* at 470–72, 499–502.

On April 5, 2022, Strother received additional radiographic imaging at Rapides Regional Medical Center. *Id.* at 492–95. The x-rays of her right hand and shoulder

did not indicate any fractures or abnormalities. *Id.* at 494–95. The x-ray of her left ankle suggested that Strother had a significant ankle sprain. *Id.* at 492. Strother also received a chest x-ray after reporting she had a cough. *Id.* at 493. That x-ray was normal. *Id.*

On April 5, 2022, Strother went to the Brian Clinic, LLP, for a follow-up visit. *Id.* at 456. She still had some swelling in her ankle. *Id.* Her medical provider opined that her spinal stenosis diagnosis may have contributed to her fall. *Id.* During her visit, she complained that her shoulders hurt "all the time" and that she still had brain fog after her COVID-19 infection. *Id.* She was assessed with essential (primary) hypertension, fibromyalgia, chronic fatigue, unspecified strain of unspecified ligament of her left ankle, sprain of unspecified muscle and tendon at ankle and foot level in her left foot, traumatic arthropathy at an unspecified site, and spinal stenosis in her cervical region. *Id.* at 458. She was referred to a neurologist. *Id.*

On July 6, 2022, Dr. Brunson completed a medical source statement for Strother. *Id.* at 526–28. Dr. Brunson opined that, during the course of an eight-hour workday on a five day per week basis, Strother could: stand and/or walk for a total of one hour and sit for a total of two hours; lift and/or carry less than ten pounds on an occasional and/or frequent basis; stoop very little; reach with her upper extremities occasionally; and perform fingering type movements and gross manipulative movements occasionally. *Id.* at 526–27. Additionally, Dr. Brunson found that Strother's abnormal lupus test, arthritis, long COVID-19, and spinal disc disease rendered it "medically advisable that [Strother] periodically elevate on or both lower

extremities during the course of an 8-hour workday." *Id.* at 527. Dr. Brunson opined that Strother was not "capable of performing full-time work activity, be it sedentary, light, or otherwise on a sustained basis." *Id.* at 528. She found it was "more probable than not" that Strother's limitations were applicable as of and prior to March 31, 2022. *Id.*

C. <u>Administrative Hearing</u>

The administrative hearing began with opening remarks from Strother's attorney. ECF No. 8-1 at 37–38. Strother's attorney stated that Strother suffered from long COVID-19, which manifested as fatigue, lung respiratory problems, brain fog, and confusion. *Id.* at 37. Strother's attorney represented that Strother had to use a nebulizer two to three times daily and an inhaler. *Id.* Strother's attorney further represented that Strother had lupus, which caused "chronic pain, numbness in both hands, trouble walking at times, and [] joint pain in most of her joints." *Id.* Finally, her attorney stated that Strother previously worked in accounts payable and as a housekeeper, but she had stopped working in March 2020. *Id.* at 37–38.

The ALJ then examined Strother. *Id.* at 38–42. Strother testified that she lived with her son, husband, and mother. *Id.* at 38. She did not have a current source of income. *Id.* She stated that she could drive but not take long trips. *Id.* at 39. She had attended some college but was no longer pursuing her degree. *Id.*

Strother testified she had last worked in 2020. *Id.* She stated she was hospitalized for COVID-19 in August 2020 and had not worked since then. *Id.* She clarified that she asserted a disability onset date of March 2020 because she had filed

a disability claim based on her lupus, arthritis, and Von Willebrand's Disease. *Id.* at 39–40.

Strother testified that she worked at Jena Choctaw Pines Casino in accounts payable from 2013 to 2015. *Id.* at 41. That job was mostly a desk job and did not involve lifting and carrying. *Id.* However, that job had additional duties beyond accounts payable, including booking bands for the casino, acting as a purchase manager, and auditing the machines. *Id.* Prior to working at Jena Choctaw Pines Casino, she worked in accounts payable/receivable at Marler Ford. *Id.* at 42. That position was also a desk job and did not require lifting and carrying. *Id.*

Strother's attorney then examined Strother. *Id.* at 42–46. Strother testified that her symptoms would prevent her from working in accounts payable because sitting would cause her neck, back, and arms to hurt and her hands to go numb. *Id.* at 43. She testified that she had difficulty holding onto things. *Id.* She reported that her lower extremities would swell daily, and the swelling was only alleviated by propping her legs up and taking medication. *Id.* She did not think she could use a keyboard "because [her] neck and everything would hurt then." *Id.* at 44.

Strother then recounted her symptoms associated with long COVID-19. *Id.* She complained of a dry, constant cough, brain fog, fatigue, worsening depression and anxiety, aches and pains, and shortness of breath. *Id.* She testified that she had to use her inhaler two to three times daily and her "breathing machine" three to four times daily. *Id.* at 44–45. She stated that when she is "trying to do anything," she gets "really exhausted and short of breath." *Id.* at 45. Strother testified that she had

"chronic pain constantly" and suffered from osteoarthritis and spinal stenosis. *Id.* at 46.

The ALJ then examined the VE. *Id.* at 46–51. The VE testified that Strother's first occupation at Marler Ford was classified as an account payable clerk or accounting clerk and had a sedentary exertional level. *Id.* at 47. Strother's second occupation at Jena Choctaw Pines Casino was a composite job with two components: accounting clerk and purchasing clerk. *Id.* at 49. Both components had a sedentary exertional level. *Id.*

The ALJ directed the VE to consider a hypothetical individual that had the same age, education, and work history as Strother. *Id.* The ALJ asked the VE to further assume that individual was limited to sedentary work; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; had to avoid concentrated exposure to pulmonary irritants, such as dust, fumes, gases, and poor ventilation; and was limited to simple, routine, repetitive work and simple work-related decision. *Id.* The VE testified that this individual could not perform Strother's past work but could work as a final assembler, compact assembler, or jewelry preparer. *Id.* at 49–50.

The ALJ then modified the hypothetical to further limit the individual to performing frequent, but not constant, fingering, feeling, and handling. *Id.* at 50. The VE testified that this individual could work as a final assembler, compact assembler, or jewelry preparer. *Id.* at 51.

The ALJ then modified the hypothetical to require that the individual would either need at least two extra fifteen-minute breaks during the workday, to be off task at least 20% of the workday, or to be absent at least two days per month. *Id.* at 51. The VE testified that this limitation would preclude competitive employment. *Id.*

Strother's attorney declined to examine the VE. *Id.* at 51.

**D. ALJ's Findings and Conclusions**

The SSA promulgated a five-step sequential process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a). This process requires the ALJ to determine whether a claimant (1) is engaging in substantial gainful activity; (2) has a medically determinable severe impairment or a combination of impairments that is severe; (3) has an impairment or combination of impairments listed in or medically equivalent to those listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) has the residual functional capacity to perform her past relevant work; and (5) has the residual functional capacity, age, education, and work experience to perform any other type of work. 20 C.F.R. § 404.1520(a)(4)(i)–(v).

A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)). To be entitled to benefits, an applicant bears the initial burden of showing she is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied,

the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. *See Greenspan*, 38 F.3d at 237.

Here, the ALJ found that Strother had not engaged in substantial gainful activity since her alleged disability onset date. ECF No. 8-1 at 20. The ALJ further found Strother had the following severe impairments: degenerative disc disease, asthma, peripheral neuropathy, fibromyalgia, hypertension, arthritis, obesity, attention deficit hyperactivity disorder, anxiety, and residual sequelae of COVID-19. *Id.* at 20–21. But at Step Three, the ALJ determined that Strother did not have an impairment or combination of impairments listed in or medically equivalent to one listed in Appendix 1. *Id.* at 21–22. In so determining, the ALJ specifically considered Listings 4.00, 12.00, 12.06, and 12.11, but she found that none of Strother's impairments were "attended with the specific clinical assigns and diagnostic findings required to meet or equal the requirements set forth in these listings or any other listing." ECF No. 8-1 at 21.

The ALJ then found that Strother had the residual functional capacity to perform sedentary work, but she could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs, could never climb ladders, ropes, or scaffolds, must avoid concentrated exposure to pulmonary irritants, such as dust, fumes, gases, and poor ventilation, and was limited to simple, routine, repetitive work and simple work-related decisions. *Id.* at 22. At Step Four, the ALJ determined that Strother did not have the residual functional capacity to perform her past relevant work. *Id.* at 26. At Step Five, the ALJ considered Strother's age, education, and work experience and

determined she had the residual functional capacity to work as a final assembler, compact assembler, or jewelry preparer. *Id.* at 27.

Accordingly, the ALJ concluded that Strother was not under a disability as defined in the SSA at any time from the alleged disability onset date through March 31, 2022, the date last insured. *Id.*

## II. Law and Analysis

### A. Scope of Review

A court's review of social security disability claims is "exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating the evidence." *Boone v. O'Malley*, No. 23-40401, 2023 WL 9018388, at *1 (5th Cir. Dec. 29, 2023) (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)).

"When substantial evidence supports the ALJ's findings, these findings 'shall be conclusive' and must be affirmed." *Daigle v. Kijakazi*, No. 22-30721, 2023 WL 4501865, at *1 (5th Cir. July 12, 2023) (citing 42 U.S.C. § 405(g)). For the evidence to be substantial, it must be "more than a scintilla and less than a preponderance," and "of such relevance that a reasonable mind would accept it as adequate to support a conclusion." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

"[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision. [The Court]

must consider the record as a whole, and the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986). A court reviewing the Commissioner's decision "may not retry factual issues, reweigh evidence, or substitute [its] judgment for that of the fact finder." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983); *see also Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Daigle*, 2023 WL 4501865, at *1.

A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See *Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

Here, Strother argues the ALJ (1) "failed to articulate a rational, medical, and evidentiary basis for ruling" that Strother could "work on a daily basis, at any job, as part of [her] Residual Functional Capacity," (2) did not consider relevant listing criteria, and (3) did not classify lupus or Von Willibrand's disease as severe impairments. ECF No. 9 at 2, 8. The Court considers each error in the order in which it appears at the sequential evaluation process.

B. <u>The ALJ erred at Step Two by failing to consider the severity of each claimed impairment.</u>

At Step Two, the ALJ is tasked with determining whether a claimant has a medically determinable severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "[A]n impairment is not severe 'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Johnson v. Colvin*, 595 F. App'x 443, 444 (5th Cir. 2015) (quoting *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985)).

Here, the ALJ found Strother's degenerative disc disease, asthma, peripheral neuropathy, fibromyalgia, hypertension, arthritis, obesity, attention deficit hyperactivity disorder, anxiety, and residual sequelae of COVID-19 were severe impairments because they "significantly limit[ed] [Strother's] ability to perform basic work activities." ECF No. 8-1 at 20. The ALJ found Strother's ankle sprain was not a severe impairment. *Id.* at 20–21.

Strother argues the ALJ erred by failing to determine the severity of her lupus and Von Willibrand's disease. ECF Nos. 9 at 8 & 11 at 4. The Court agrees. Despite Strother alleging disability based, in part, on her lupus and Von Willebrand's disease, *see e.g., id.* at 39–40, the ALJ omitted those claimed impairments in the Step Two analysis. The ALJ's failure to consider the severity of a claimed impairment is error.

C. <u>The ALJ's Step Two was not harmless because it resulted in an improper and incomplete analysis at Step Three.</u>

Having determined the ALJ erred at Step Two, the Court now determines whether that error is harmless. "Procedural perfection in administrative proceedings is not required. Th[e] court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). "Remand is required only when there is a realistic possibility that the ALJ would have reached a different conclusion absent the procedural error." *Wilder v. Colvin*, No. 13-CV-3014, 2014 WL 2931884, at *5 (N.D. Tex. June 30, 2014). The claimant bears the burden of showing that the ALJ's error was prejudicial. *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012).

The ALJ's failure to make a specific severity finding at Step Two is harmless if the ALJ proceeds with the sequential evaluation process and considers the effect of the impairment and its symptoms at the relevant steps. *See Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010) (finding "the ALJ's failure to assess the severity of Herrera's anxiety or learning impairments . . . is not a basis for remand" because "this case did not turn on a finding that Herrera's impairments were not severe"); *Dise v. Colvin*, 630 F. App'x 322, 324 (5th Cir. 2015) ("Dise's request for benefits was not denied based on an improper determination of 'non-severity' at step two. The remainder of the opinion clearly reflects that the ALJ considered all of Dise's claimed impairments in his assessment of Dise's disability."); *Chaparro v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987).

Here, the ALJ's error was not harmless because the ALJ's Step Two error tainted her Step Three analysis. At Step Three, a claimant is found disabled if her impairment meets or equals an Appendix 1 listing. 20 C.F.R. § 404.1520(a)(4)(iii). A claimant bears the "burden of establishing that his impairment meets or equals the criteria for presumptive disability described in the listings." *Whitehead v. Colvin*, 820 F.3d 776, 781 (5th Cir. 2016).

In this case, the ALJ specifically considered Strother's "physical impairments" under Listings 4.00 and 12.00. ECF No. 8-1 at 21. The ALJ does not identify which physical impairments were considered. Given the ALJ's failure to discuss Strother's lupus and Von Willebrand's disease at Step Two, those impairments likely were not considered at Step Three.[1]

But even assuming the ALJ considered Strother's lupus and Von Willebrand's disease under those Listings, Strother correctly asserts that the ALJ did not explicitly consider the more relevant Listings 7.00 (Hematological Disorders) and 14.02 (Systemic Lupus Erythematosus) for those impairments. ECF Nos. 8-1 at 21 & 9 at 8–9. The ALJ's unsupported and conclusory assertion that Strother's physical impairments did not "meet or equal the requirements set forth in . . . any other listing" is insufficient. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (holding that

[1] This conclusion is further strengthened by the ALJ's failure to include these impairments when summarizing Strother's alleged disabling conditions. *See* ECF No. 8-1 at 23 (mentioning only degenerative disc disease, arthritis, asthma, peripheral neuropathy, fibromyalgia, hypertension, arthritis, residual sequelae of COVID, obesity, attention deficit hyperactivity disorder, and anxiety).

"the ALJ erred in failing to state any reason for her adverse determination at step 3").

An ALJ's failure to explain the basis for her decision in Step Three affects substantial rights when the claimant appears to meet her burden to demonstrate that she meets or equals an Appendix 1 Listing. *See Audler*, 501 F.3d at 449. In this matter, Strother's substantial rights have been affected because Strother appears to meet her burden to demonstrate she meets or equals Listing 14.02.

For Listing 14.02, the claimant must satisfy the criteria set forth in either Paragraph A or B. The record adduced in this matter suggests Strother may be able to demonstrate that she satisfies the Paragraph A criteria. Paragraph A requires:

> Involvement of two or more organs/body systems, with:
>
> 1. One of the organs/body systems involved to at least a moderate level of severity; and
>
> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 14.02.

The medical evidence shows that Strother has repeatedly complained of joint and musculoskeletal pain and further suggests a demonstrated history of fatigue, fever, and malaise. Ultimately, the ALJ may find Strother does not satisfy the Listing 14.02 criteria. But "[a]bsent some explanation from the ALJ to the contrary, [Strother] would appear to have met her burden of demonstrating that she meets the Listing requirements" for 14.02, and, as such, "her substantial rights were affected

by the ALJ's failure to set out the bases for her decision at step three." *Audler*, 501 F.3d at 449.

Because the Court has found the ALJ committed harmful error at both Steps Two and Three with respect to Strother's lupus, the Court does not consider any other allegations of error, including Strother's contention that the ALJ failed to consider other relevant listings at Step Three. Such findings are not necessary because the identified error alone is dispositive and warrants remand.

In sum, the ALJ's failure to consider the severity of Strother's lupus tainted the ALJ's analysis in Step Three. Had the ALJ considered the effects of Strother's lupus, the ALJ may have reached a different result.[2] Strother is thus prejudiced by that error, and the error is not harmless. *See Bishop v. Comm'r of Soc. Sec. Admin.*, No. 18-CV-00210, 2019 WL 1292812, at *5 (W.D. Tex. Mar. 21, 2019) (remanding where "[t]he ALJ never considered whether Bishop's [] impairments were severe, whether the impairments satisfied any of the listings, or whether this diagnosis rendered her functionally impaired"); *Vertron L. v. Kijakazi*, No. 20-CV-1146, 2021 WL 6274749, at *6 (N.D. Tex. Dec. 13, 2021), *report and recommendation adopted*, No. 20-CV-1146, 2022 WL 35754 (N.D. Tex. Jan. 4, 2022) ("[T]he ALJ's failure to conduct the severity analysis . . . at step two, and her subsequent failure [to] consider its impact at step three, prejudiced Plaintiff.").

Remand is required.

---

[2] *Compare with Polk o/b/o E.A.W. v. Berryhill*, No. 17-CV8167, 2019 WL 181483, at *6 (E.D. La. Jan. 14, 2019) (finding harmless error where "the ALJ's opinion clearly reflects that the ALJ considered all of E.A.W.'s claimed impairments, including developmental delays, in his assessment of E.A.W.'s disability").

## III. Conclusion

Because the ALJ committed a harmful legal error, IT IS RECOMMENDED that Strother's appeal (ECF No. 1) be GRANTED, the final decision of the Commissioner be VACATED, and the case be REMANDED for further proceedings consistent with this Report and Recommendation.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

SIGNED on Monday, July 20, 2026.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE